United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 11, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-30539

_____

LOUISIANA LAND AND EXPLORATION CO.; ET AL,

Plaintiffs,

versus

OXY USA, INC.; ET AL,

Defendants,

OXY USA, INC.,

Defendant-Cross-Claimant-Appellee,

versus

ONLINE RESOURCES, INC.,

Defendant-Cross-Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
(01-CV-2236-S)
--------------------

Before HIGGINBOTHAM, SMITH, and WIENER, Circuit Judges.

PER CURIAM:[*]

Defendant-Cross-Defendant-Appellant Online Resources, Inc.

("Online") appeals from the district court's determination that, by

virtue of a Purchase Sale Agreement ("PSA") between Online and OXY

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

USA, Inc. ("OXY"), signed December 31, 1998 and expressly made effective on December 1, 1998, Online and not OXY is responsible for, inter alia, the agreed ratable costs of plugging and abandoning a well on a government mineral lease (the "subject lease") of a specified tract on the Outer Continental Shelf offshore from the coast of Louisiana. The subject lease was in full force and effect on the effective date specified in the PSA and on the date the PSA was signed, but terminated subsequent to those dates.[1]

The PSA was, in essence, a contract by which OXY disposed of all of its mineral interests and related properties in a large area off the Gulf Coast for a lump sum of $3,500,000, and Online agreed to purchase all of such interests and properties, "as is" and "where is," retroactively effective as of December 1, 1998. The PSA specified that a Bill of Sale and Assignment (the "Assignment") transferring record title to all assets being conveyed as of the effective date would be executed at a date well after December 31, 1998, during which period each of the parties would perform its own due diligence. The PSA also afforded Online a period of two weeks following its signing during which to assert any title deficiencies in existence on the effective date and to make price adjustments

---

[1] The record reflects conflicting termination dates alleged by the various parties and never determined as a finding of fact by the district court, which ruled that the termination date was irrelevant inasmuch as none contends that the subject lease was not in force on December 1, 1998, on December 31, 1998, and for at least two weeks thereafter.

2

accordingly. Inasmuch as, under the earliest date asserted by Online as its termination, the subject lease was in full force and effect on the effective date, the execution date, and two weeks thereafter, no issue of its title was asserted within that two-weeks period (there was, however, a title-problem price adjustment regarding a different property in the package).

Transfers of title to all assets covered by the PSA were accomplished in the Assignment signed on May 12, 1999. That document too expressed that all transfers of title thereunder were as of the effective date of the PSA.

The instant controversy arose subsequent to the signing of the Assignment, when LL&E demanded contribution for plugging and abandoning the well in question, thus alerting the parties to the fact that the subject lease had terminated. Despite a Texas choice-of-law provision in the PSA, the parties and the court applied the law of Louisiana as mandated by the Outer Continental Shelf Lands Act ("OCSLA").

In simplest form, Online's contention that it has no responsibility for plugging and abandoning the well is grounded in the premise that, regardless of the effective date specified in the PSA and the Assignment, the subject lease had terminated before title was properly transferred in the Assignment as signed on May 12, 1999, and thus could not possibly have been transferred to Online by OXY. It follows, Online insists, that absent a valid assignment of the subject lease, Online owes no contribution to the

3

cost of plugging and abandoning the well on the tract formerly covered by the subject lease. Specifically, Online argued to the district court, and again to this court on appeal, that both the existence of the lease on the date of the Assignment and authorization of the transfer of the subject lease by the government's Mineral Management Service ("MMS") were conditions precedent ("suspensive conditions" under Louisiana law) to the valid transfer of title to the subject lease, unaffected by the lease's existence on the effective date specified in the PSA and the Assignment; and that the subject lease's expiration or termination before execution of the Assignment made transfer of the subject lease to Online —— also assertedly a suspensive condition —— a legal impossibility.

The gravamen of OXY's counterposition was that the PSA is the law between the parties and that nothing in the suppletive provisions of the Louisiana Civil Code or other such laws of that State prohibits the parties from contracting for a retroactive effective date, which they did in the PSA and confirmed in the Assignment; that the subject lease was in existence on the effective date of December 1, 1998 as well as on December 31 when the PSA was signed; that, subject only to pre-effective date title defects noticed within two weeks following the execution of the PSA, the transfer of benefits and assumption of the risk of losses to Online occurred as of the effective date; that the existence of the subject lease (and other leases and properties in the package)

4

was relevant only on the effective date (December 1, 1998) and was not relevant on May 12, 1999 when the title-transferring Assignment was signed, making lease existence in May irrelevant and thus not a suspensive condition to Online's entitlement to benefits and responsibility for obligations connected with or arising from the subject lease (or any other properties) after the effective date; and that the post-transaction refusal of the MMS to authorize transfer of the subject lease once it ceased to exist at a time after the effective date, after execution date of the PSA, and after execution of the Assignment, was neither the failure of a suspensive condition nor otherwise relevant.

The district court essentially agreed with OXY's reasoning and its position. The court determined that the precise date on which the subject lease terminated was immaterial because, even under Online's contention, the subject lease terminated well after the execution of the PSA and even further after the effective date of that agreement. The district court also concluded that the existence of the subject lease on May 12, 1999, when the Assignment was executed, was not a suspensive condition to Online's responsibility for any obligations under that lease once all the contracts were executed, any more than it would have been relative to Online's entitlement to production or other benefits under the subject lease, had there been any.

The court also ruled that MMS authorization was not a suspensive condition or a material factor but rather was merely a

routine post-closing matter that, pursuant to subsection 5.1 of the PSA would not "release [Online] of its obligation to close" the transaction. The court indicated its agreement with OXY that, because the subject lease terminated after the effective date and the execution date of the PSA, all benefits and obligations, including risk of loss and the cost of plugging and abandoning wells, had shifted from OXY to Online before the subject lease terminated. The controlling date of such shifts as to all leases and properties covered by the global sale, as memorialized in the PSA, was the effective date of December 1, 1998, as expressly and unconditionally agreed to by these sophisticated and experienced parties. MMS approval after the lease terminated, implied the district court, would have been a meaningless, hollow act.

We have reviewed the extensive record in this case and have considered the reasoning of the district court, as well as that of able counsel for the respective parties, both as set forth in their appellate briefs and expressed in their oral arguments to this court. As a result, we are satisfied that the judgment of the district court should be and is, in all respects,

AFFIRMED.